# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| BRIANA COBOS, | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | Case No.  SA-24-CA-01470-XR |
| | § | |
| DECYPHER TECHNOLOGIES, LTD., | § | |
| PETE HEGSETH, SECRETARY, | § | |
| DEPARTMENT OF DEFENSE; AND | § | |
| FRANK R. KENDALL, SECRETARY, | § | |
| DEPARTMENT OF THE AIR FORCE; | § | |
| *Defendant* | § | |

## ORDER

On this date the Court considered the status of this case. Pending before the Court are Defendant Pete Hegseth's Motion to Dismiss (ECF No. 18), Defendant Decypher Technologies, LTD's Motion to Dismiss (ECF No. 25), and Defendant Troy Meink's Motion to Dismiss (ECF No. 36), and the Responses (ECF Nos. 32, 33, 39) and Replies (ECF Nos. 34, 35, 41) thereto. After careful consideration, the Court issues the following order.

## BACKGROUND

### I. Dr. Cobos's Claims

Plaintiff Dr. Briana Cobos sues Decypher Technologies, LTD. ("Decypher") for alleged violations of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. ("ADA"), the Texas Commission on Human Rights Act, Tex. Lab. Code §§ 21.055, 21.105, 21.128 ("TCHRA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. She sues Pete Hegseth, Secretary of the Department of Defense, the Defense Health Agency ("DHA") and Troy Meinck, Secretary of the Air Force (the "Air Force") for alleged violations of Sections 501 and 504 of the Rehabilitation Act, 29 U.S.C. §§ 791, 794.

1

Dr. Cobos brings claims under different statutes against different defendants. But her claims significantly overlap, because the statutes at issue impose the same relevant liability standards.[1]

Dr. Cobos's basic theories of liability are the same against each Defendant and under each Act or provision: (1) hostile work environment based on her disabilities, (2) hostile work environment in retaliation for protected activities, (3) constructive discharge based on her disabilities, (4) constructive discharge in retaliation for protected activities, and (5) failure to accommodate Dr. Cobos's disabilities.

To aid clarity, the following chart indicates which Defendants Dr. Cobos sues under which provisions for which claims. "All theories" indicates that Dr. Cobos is bringing claims for each of the above-listed theories of liability. "None" indicates that she does not sue the relevant defendant under the relevant statute.

| | **Decypher** | **Air Force** | **DHA** |
|---|---|---|---|
| **Section 501 of the Rehabilitation Act** | None | All theories | All theories |
| **Section 504 of the Rehabilitation Act** | All theories | All theories | All theories |
| **The ADA** | All theories | None | None |
| **The TCHRA** | All theories | None | None |

---

[1] *Flynn v. Distinctive Home Care, Inc.*, 812 F.3d 422, 428–29 (5th Cir. 2016) (Section 504 of the Rehabilitation Act adopts the ADA's substantive standards to determine what conduct constitutes a violation.) (citing 29 U.S.C. 794(d)); 29 U.S.C. § 791(f) (incorporating ADA liability standards into Section 501 of the Rehabilitation Act); *Clark v. Charter Commc'ns, L.L.C.*, 775 F. App'x 764, 767 (5th Cir. 2019) ("A disability discrimination claim under the [TCHRA] maps onto federal disability discrimination law, and courts 'appl[y] the legal standards for the ADA' to such claims.").

Section 504 of the Rehabilitation Act has a heightened causation standard, but the Court need not address causation in this case. *See Flynn*, 812 F.3d at 428; *Pinkerton v. Spellings*, 529 F.3d 513, 515–17 (5th Cir. 2008) (acknowledging Section 504's heightened causation standard and rejecting the argument that Section 501 imposes the same heightened standard).

## II. Factual Background

The following facts are derived from Dr. Cobos's Second Amended Complaint and are taken as true for purposes of adjudicating these Motions to Dismiss. *See Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir. 2002).

In April 2022, Decypher hired Dr. Cobos to work as a contract Research Director for the Diabetes Center of Excellence ("DCOE") pursuant to a Performance Work Statement ("PWS") contract between Decypher, DHA, and the Air Force. ECF No. 48 ¶ 44. Dr. Cobos was required to work on-site at DCOE, first at Wilford Hall Ambulatory Surgical Center (from July 2022 to July 2023) and then at Brooke Army Medical Center (from July 2023 to November 2023). *Id.* ¶ 46. Dr. Cobos alleges that she has multiple disabilities that substantially limit her daily life activities. *Id*. ¶¶ 61–62. Upon starting at DCOE, she informed her supervisors of those disabilities and that she would need to attend regular medical appointments. *Id*. ¶ 64.

One day in August 2022, Dr. Cobos arrived four minutes late to a 7:30 a.m. "morning huddle" because one of her medical conditions had flared up. *Id*. ¶ 68. Air Force Lieutenant Colonel/Dr. Darrick Beckman—who was the DCOE clinic director and Dr. Cobos's DHA supervisor at the time—allegedly berated her in front of her colleagues for being late. *Id*. ¶¶ 54, 69. On another day, Dr. Beckman required her to take fifteen minutes of paid time off ("PTO") because she needed to leave work fifteen minutes early for a doctor's appointment, even though Decypher had approved Dr. Cobos's leaving early if she made up the time. *Id*. ¶¶ 71–72. Indeed, according to Dr. Cobos, Dr. Beckman regularly reprimanded her if she arrived late or had to leave early, and questioned her integrity, intelligence, and value in front of colleagues. *Id*. ¶¶ 75–78. Dr. Beckman allegedly did not treat other employees the same way if they arrived late or needed to flex their schedules. *Id*. ¶ 78. Further, Dr. Cobos asked Dr. Beckman for a flexible work schedule and the

3

ability to telework because of her medical conditions, but he denied the request. *Id.* ¶¶ 73–74. Plaintiff reported Dr. Beckman's behavior to Michael Leo, her supervisor at Decypher, in September 2022. *Id.* ¶¶ 57, 81.

About one month later, Decypher officials, including Mr. Leo and Deborah Heifner, Decypher's Corporate Vice President, met with Dr. Cobos and Dr. Beckman to discuss Dr. Cobos's accommodation request. *Id.* ¶ 81. Dr. Beckman allegedly agreed to allow Dr. Cobos to telework and flex her time as needed so long as Decypher was notified. *Id.*

One month later, in November 2022, Dr. Beckman rescinded the arrangement, saying the accommodations were "favoritism" and that the contract between DHA and Decypher did not allow teleworking or a flexible schedule. *Id.* ¶¶ 82–83. As a result, Dr. Cobos had to use her PTO to attend medical appointments and address medical flare-ups. *Id.* ¶ 84. Her PTO quickly ran out, forcing her to take leave without pay for appointments and flare-ups. *Id.* ¶ 85.

In January 2023, Dr. Cobos emailed Mr. Leo and Ms. Heifner formally requesting the ability to telework and a flexible work schedule as accommodations for her disabilities. *Id.* ¶ 89. In February 2023, Decypher tentatively approved the request. *Id.* ¶ 91. Later that month, Dr. Cobos met with DCOE leadership about the request. *Id.* ¶ 92. They did not object. *Id.* ¶ 93. So Mr. Leo notified the contracting officer representative about the accommodations on February 23, 2023. *Id.* ¶ 94.

Nonetheless, when Dr. Cobos arrived late due to a medical flare-up on March 2, 2023, DCOE management directed her to use PTO to cover the time. *Id.* ¶ 96. After Dr. Cobos mentioned her accommodations, that order was rescinded. *Id.* ¶ 97. But DCOE staff allegedly began to "micromanage" Dr. Cobos's timesheet and her use of flextime and to monitor her whereabouts when she was in the office. *Id.*

On March 29, 2023, Dr. Cobos notified Decypher that she felt unsafe working at DCOE due to "continued hostility, workplace bullying, and disrespect from military personnel toward her." *Id*. ¶ 99. She informed Decypher that she was not resigning but would begin looking for another job. *Id*. Decypher then allegedly posted her position online and began accepting applications. *Id*. ¶ 100.

In July 2023, DCOE moved to Brooke Army Medical Center's Endocrinology Department. *Id*. ¶ 101. The same month, DHA's Contract Monitor told DCOE management that Decypher never notified DCOE of Dr. Cobos's accommodation request and that DCOE had not approved the request. *Id*. ¶ 106.

Dr. Cobos then contacted the Joint Base San Antonio/502d Air Base Wing's Equal Employment Opportunity ("EEO") Office regarding the "revocation of her reasonable accommodation." *Id*. ¶ 109. The office directed her to file her complaint with the DHA's EEO office instead. *Id*. ¶ 110.

On July 26, 2023, DHA's Contracting Officer Representative informed Dr. Cobos that the PWS did not authorize teleworking. *Id*. ¶ 111. Dr. Cobos later learned that Air Force Contracting Officer Laura Herring refused to add a telework clause to the contract, claiming the PWS could not be modified to allow telework. *Id*. ¶¶ 113–14.

In August 2023, Dr. Cobos had to take unpaid leave on several occasions because she was not allowed to telework and needed to be out of the office due to her medical conditions and a surgical procedure. *Id*. ¶¶ 116, 119.

In September 2023, DCOE officials again denied Dr. Cobos's requests to telework and for a flexible work schedule, saying those accommodations would constitute "preferential treatment." *Id*. ¶ 121.

Dr. Cobos contacted DHA's EEO office on September 1 and October 18, 2023, to report disability discrimination, harassment, failure to accommodate, and retaliation. *Id.* ¶¶ 122–23. On October 23, 2023, she informed Decypher of the alleged hostile work environment at DCOE, including "micromanagement of her time and inappropriate comments regarding her disabilities." *Id.* ¶ 124.

DCOE staff continued to direct Dr. Cobos to take PTO when she arrived late, even if she made up the time. *Id.* ¶ 126. And Nurse San Juana Barbosa, who was by then Dr. Cobos's direct supervisor through DHA, increasingly criticized and scrutinized Dr. Cobos. *Id.* ¶ 128. At one point, upon arriving late because of a medical flare-up, Dr. Cobos found Ms. Barbosa knocking aggressively on her office door. *Id.* ¶ 129. Ms. Barbosa then followed Dr. Cobos into her office and "interrogate[d]" her about her medical conditions and medications. *Id.*

Shortly thereafter, on November 6, 2023, Dr. Cobos learned that contract employees like her would be reprimanded if they were not physically present in the office from 7:30 a.m. to 4:30 p.m., regardless of whether they used PTO. *Id.* ¶ 130.

Dr. Cobos resigned on November 17, 2023, because of her health, Defendants' refusal to allow telework or a flexible schedule, and the "continued hostility of the workplace." *Id.* ¶ 136

## III. Exhaustion of Administrative Remedies

Dr. Cobos alleges that she has exhausted her administrative remedies. Because Dr. Cobos's claims against the Air Force fail for other reasons, the Court omits the details of her alleged exhaustion as to those claims.

a. <u>DHA</u>

As to her claims against DHA, Dr. Cobos alleges that:

On September 1, 2023, she contacted DHA's EEO Complaint Manager to report disability discrimination and harassment, failure to accommodate, and retaliation. *Id.* ¶ 23.

On October 18, 2023, she contacted DHA's EEO office to report disability discrimination, harassment, failure to accommodate, and retaliation. *Id.* ¶ 24.

On October 25, 2023, she contacted DHA's EEO office to initiate a complaint. *Id.* ¶ 25.

On December 15, 2023, she filed a formal complaint of discrimination with DHA's EEO Office. *Id.* ¶ 26. DHA assigned a complaint number (DHA-202410-0007) but has not issued a final decision in that matter. *Id.* ¶ 27.

b. Decypher

Dr. Cobos next alleges she has exhausted her administrative remedies for her claims against Decypher by timely filing an Employment Discrimination Complaint with the Texas Workforce Commission Civil Rights Division (the "Workforce Commission"). *Id.* ¶ 38.

On April 3, 2024, Dr. Cobos submitted a charge to the Workforce Commission. *Id.* ¶ 39. The next day, the Workforce Commission issued an Inquiry Dismissal Notice and informed Dr. Cobos that, because Decypher was a contractor for a federal agency, the Workforce Commission would take no further action and would not file a charge on Dr. Cobos's behalf with the Federal EEO Commission ("EEOC"). *Id.* ¶ 40. The Workforce Commission directed Dr. Cobos to file a complaint with the required federal agency and, separately, to file her complaint with the Department of Labor, Office of Federal Contract Compliance Program. *Id.*

On April 8, 2024, Dr. Cobos filed a complaint with the Office of Federal Contract Compliance Program. *Id.* ¶ 41.

On September 27, 2024, the Office of Federal Contract Compliance Program issued Dr. Cobos a Notice of Right to sue in federal or state court within 90 days. *Id.* ¶ 43.

**IV. Procedural Background**

Dr. Cobos filed this action on December 26, 2024, against DHA and Decypher. ECF No. 1. She subsequently added the Air Force as a defendant. ECF No. 12.

The Defendants moved to dismiss for lack of subject matter jurisdiction and failure to state a claim. ECF No. 18 (DHA); ECF No. 25 (Decypher); ECF No. 36 (Air Force). Dr. Cobos filed responses to the motions (ECF Nos. 32, 33, 39), and each defendant filed a reply (ECF Nos. 34, 35, 41). On March 24, 2025, the parties filed a joint motion for the Court to stay this case pending resolution of the Motions to Dismiss. ECF No. 31. The Court granted the motion.

## DISCUSSION

**I. Legal Standards**

    a.  <u>12(b)(1) Standard</u>

A 12(b)(1) motion seeks dismissal for lack of subject matter jurisdiction. FED. R. CIV. P. 12(b)(1). In ruling on a Rule 12(b)(1) motion, a court may rely on: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Freeman v. United States*, 556 F.3d 326, 334 (5th Cir. 2009). "Because [the] issue in a factual 12(b)(1) motion is the trial court's jurisdiction[,] . . . the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981) (quoting *Mortensen v. First Fed. Sav. and Loan Assoc.*, 549 F.2d 884, 891 (3rd Cir. 1977)). In short, a plaintiff's allegations are not presumed true, and the Court may resolve factual disputes

to determine whether it has jurisdiction. *Id.* at 413. Materials such as affidavits and regulations can be considered when relevant. *Poindexter v. United States*, 777 F.2d 231 (5th Cir. 1985).

  b.  12(b)(6) Standard

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for the dismissal of a complaint for "failure to state a claim upon which relief can be granted." Under the 12(b)(6) standard, a court cannot look beyond the face of the pleadings. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A claim for relief must contain: (1) "a short and plain statement of the grounds for the court's jurisdiction"; (2) "a short and plain statement of the claim showing that the pleader is entitled to relief"; and (3) "a demand for the relief sought." FED. R. CIV. P. 8(a). A plaintiff "must provide enough factual allegations to draw the reasonable inference that the elements exist." *Innova Hosp. S.A., L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 995 F. Supp. 2d 587, 602 (N.D. Tex. Feb. 3, 2014) (citing *Patrick v. Wal–Mart, Inc.-Store No. 155,* 681 F.3d 614, 617 (5th Cir. 2012)); *see also Torch Liquidating Trust ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 384 (5th Cir. 2009) ("[T]he complaint must contain either direct allegations or permit properly drawn inferences to support every material point necessary to sustain a recovery." (Quotation marks and citations omitted)).

In considering a 12(b)(6) motion, the complaint's factual allegations are taken as true, and the facts are to be construed in the light most favorable to the nonmoving party. *Fernandez-Montes*

*v. Allied Pilots Ass'n.*, 987 F.2d 278, 284 (5th Cir. 1993). Still, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "'[N]aked assertions' devoid of 'further factual enhancement,'" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not presumed true. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (stating that the Court should neither "strain to find inferences favorable to the plaintiffs" nor accept "conclusory allegations, unwarranted deductions, or legal conclusions").

As noted, a court generally cannot look beyond the pleadings in deciding a 12(b)(6) motion. *Baker*, 75 F.3d at 196. When a party presents "matters outside the pleadings" in this context, a court has "complete discretion" to either accept or exclude the evidence for purposes of determining the motion. *Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 196 n.3 (5th Cir. 1988); *accord Gen. Retail Serv., v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 783 (5th Cir. 2007). But if "matters outside the pleading[s] are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." FED. R. CIV. P. 12(d).

Nevertheless, "pleadings" for purposes of a Rule 12(b)(6) motion include attachments to the complaint. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Similarly, the Court may "consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claim[]." *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014) (internal

quotation marks omitted); *see Walch v. Adjutant General's Dept. of Texas*, 533 F.3d 289, 293–94 (5th Cir. 2008) (determining reliance on documents attached to a response to a motion to dismiss appropriate where the documents were "sufficiently referenced in the complaint"). It is also "proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007). As such, documents in these three categories may be considered without converting the motion to dismiss into a motion for summary judgment.

## II. Analysis

Dr. Cobos brings claims under Sections 501 and 504 of the Rehabilitation Act, 29 U.S.C. §§ 791, 794, under the ADA, 42 U.S.C. § 12101, *et seq*., and under the TCHRA, Tex. Lab. Code §§ 21.055, 21.105, 21.128. As noted above, these statutes impose the same relevant liability standards. *See supra* n.1. So the Court will differentiate between them only when necessary.

a. <u>Jurisdiction</u>

The Court will first address its jurisdiction. *See Porretto v. City of Galveston Park Bd. of Trs.*, 113 F.4th 469, 481 (5th Cir. 2024) ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits."). The Air Force and DHA (the "Government Defendants") make three primary jurisdictional arguments.

1. *The Tucker Act*

First, the Government Defendants argue that the Tucker Act divests the Court of jurisdiction over Dr. Cobos's claims. *See* ECF No. 34 at 1; ECF No. 36 at 3. Under the Tucker Act, subject matter jurisdiction is vested exclusively in the Claims Court if: "(1) the action is against the United States; (2) the action is founded upon . . . government contract; and (3) the

action seeks monetary relief in excess of $10,000." *Amoco Prod. Co. v. Hodel*, 815 F.2d 352, 359 (5th Cir. 1987). Dr. Cobos does not dispute the first or third elements.

Whether the government's purported liability is "founded upon" a contract depends "on whether liability arises from the breach of a contractual promise." *U.S. Marine, Inc. v. United States*, 478 F. App'x 106, 109 (5th Cir. 2012). That may be the case even if the cause of action is not explicitly for breach of contract. *See id.* at 109–110 (finding a trade secrets claim "founded upon" a contract because the government's alleged liability was for "breach of a duty . . . stem[ming] directly from" the contract).

Dr. Cobos does not allege that anyone breached the PWS or a duty arising therefrom. Rather, she alleges that the Government Defendants used the PWS as an excuse to violate an independent duty arising from federal statute. It is unclear how liability could "arise[] from the breach of a contractual promise" when no contractual promise has been breached. *Id.* The Tucker Act does not divest this Court of jurisdiction.

## 2. *Section 504 Claims Against the Government Defendants*

The Government Defendants next contend that Dr. Cobos's claims against them under Section 504 of the Rehabilitation Act must be dismissed based on sovereign immunity. They argue that sovereign immunity bars monetary damages against them under Section 504 and that Dr. Cobos has not sought equitable relief.

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). The Rehabilitation Act does not waive the Federal Government's sovereign immunity against monetary damages for violations of

Section 504. *Lane v. Pena*, 518 U.S. 187, 192 (1996). So Dr. Cobos may not bring Section 504 claims for monetary damages against the Government Defendants.

In response to that point, Plaintiff cites case law supporting the general availability of monetary damages under Section 504. But she does not address sovereign immunity or suggest she is requesting any non-monetary relief. *See Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 459 (5th Cir. 2022) ("A plaintiff abandons claims when it fails to address the claims or oppose a motion challenging those claims.").

Dr. Cobos's Section 504 claims against the Government Defendants are thus **DISMISSED**.

### 3. *Punitive Damages Against the Government Defendants*

Next, DHA argues that, to the extent Dr. Cobos's Section 501 claims against it survive, they cannot support a punitive damages award. Damages for Section 501 claims are those authorized under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. Section 1981(b). 29 U.S.C. § 794a(a)(1); 42 U.S.C. § 1981a(a)(2)–(3). Those provisions do not allow punitive damages against government defendants. 42 U.S.C. § 1981a(b)(1) ("A complaining party may recover punitive damages under this section against a respondent (*other than a government, government agency or political subdivision*) . . . ." (emphasis added)). So Dr. Cobos's claims for punitive damages against the Government Defendants are **DISMISSED**.

### 4. *Emotional Distress Damages Against the Government Defendants*

Emotional distress damages pose a more difficult question. As a general matter, Title VII "allow[s] an award of compensatory damages for emotional distress or mental anguish." *Gordon v. JKP Enterprises Inc.*, 35 F. App'x 386 (5th Cir. 2002); *see* 42 U.S.C. § 1981a(b)(3) (limiting the amount of compensatory damages available for, among other things, "emotional pain,

suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses"); *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 240 (2022) (Breyer, J., dissenting). And the statute does not explicitly carve out governmental defendants from liability for emotional damages as it does for punitive damages. *See* 42 U.S.C. § 1981a.

Defendants point to various cases holding that "emotional distress damages are not available under the [Rehabilitation Act]." *See, e.g.*, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 948 F.3d 673, 680 (5th Cir. 2020), *aff'd*, 596 U.S. 212 (2022). But those cases all concern Section 504, not Section 501. *See id.* at 674–75; *Cummings*, 596 U.S. at 217; *McDaniel v. Syed*, 115 F.4th 805, 811 (7th Cir. 2024); *A.W. by & Through J.W. v. Coweta Cnty. Sch. Dist.*, 110 F.4th 1309, 1313 (11th Cir. 2024), *cert. denied sub nom. A. W., by & through J. W. v. Coweta Cnty. Sch. Sys.*, 145 S. Ct. 1058 (2025); *Bell v. Williams*, 108 F.4th 809, 834 n.5 (9th Cir. 2024).

That distinction matters. Because Section 504 was enacted pursuant to the Spending Clause, any conditions it imposes on receipt of federal funds must be unambiguous. *Cummings*, 596 U.S. at 219 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). It does not unambiguously allow emotional distress damages. *Id.* at 220 (finding that Section 504 was "silent as to available remedies").

The first of those points has an analogue here: For emotional distress damages to be available against the Government Defendants, there must be "an unmistakable statutory expression of congressional intent to waive the Government's immunity" from liability for those damages. *F.A.A. v. Cooper*, 566 U.S. 284, 291 (2012). But, unlike in the case of Section 504, there *is* such an unmistakable expression as to violations of Section 501. Section 1981a provides remedies for Section 501 claims. 42 U.S.C. § 1981a(a)(2)–(3). It allows compensatory damages but expressly limits "[t]he sum of the amount of compensatory damages" for, among other things, "emotional

pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." *Id.* § 1981a(b)(3). There would be no point in limiting such damages if they were not available. So, subject to statutory limitations, a plaintiff can seek emotional distress damages for a governmental defendant's violation of Section 501. *See Cooper*, 566 U.S. at 291 ("Congress need not state its intent [to waive sovereign immunity] in any particular way.").

Dr. Cobos may seek emotional distress damages against the Government Defendants on her Section 501 claims to the extent they otherwise survive.

b.  Claims Against The Air Force

Having addressed the parties' jurisdictional arguments, the Court turns to Dr. Cobos's claims against the Air Force. The Air Force argues that it is an improper defendant under Section 501 because (1) it does not have an employment relationship with Dr. Cobos and (2) to the extent it does have such a relationship, this case involves non-justiciable issues of internal military affairs. Because the Court agrees with the first argument, it need not address the second.

"To determine whether an entity exercises enough control over an individual to qualify as his employer, [the Fifth Circuit] appl[ies] a 'hybrid economic realities/common law control test.'" *Perry v. VHS S.A. Partners, L.L.C.*, 990 F.3d 918, 928–29 (5th Cir. 2021) (quoting *Deal v. State Farm Cnty. Mut. Ins. Co. of Tex.*, 5 F.3d 117, 118–19 (5th Cir. 1993)). "The right to control the employee's conduct is the most important component." *Id.* at 929. The control component "focus[es] on the right to hire and fire, the right to supervise, and the right to set the employee's work schedule." *Id.* The "economic-realities component . . . focuses on who paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment." *Id.*

According to the Air Force, federal statute establishes that DHA, and not the Air Force, exercised control over Dr. Cobos. *See Bloom v. Bexar Cnty., Tex.*, 130 F.3d 722, 724 (5th Cir.

1997) (finding no employment relationship between county and employee where state statute "vest[ed] control" of the relevant category of employees in the state, not the county). DCOE is a "military medical treatment facility." 10 U.S.C. § 1073c(j). Such facilities are administered by the Director of DHA. *Id.* § 1073c(a). Applicable statutes contemplate that military-department officials will work at military medical treatment facilities, including as "military commander[s] or director[s]." *Id.* §§ 1073c(a)(3)–(4); 1073d(a) ("[T]he Secretary of Defense, *in consultation with the Secretaries of the military departments*, shall maintain the military medical treatment facilities." (Emphasis added)). The statutes also contemplate that such officials sometimes act on behalf of the military departments—for instance when "ensuring the readiness of the members of the armed forces at" the facility—and at other times act on behalf of DHA—such as when "furnishing . . . health care and medical treatment." *Id.* § 1073c(a)(3).

Dr. Cobos worked as a "research Program Director for the [DHA], at [DCOE]." ECF No. 48 ¶ 44. Her duties focused on research. *Id.* ¶ 45. She alleges that Air Force officers supervised her and that the Air Force "managed the execution of the [PWS]." *Id.* ¶¶ 48, 58. Further, an Air Force official claimed that the Air Force "held the task under" the PWS. *Id.* ¶ 60. The same official refused to add a telework clause to the PWS. *Id.* ¶ 113.

But the complaint does not adequately allege that these officials' challenged actions—concerning a medical researcher and her medical research—were taken on behalf of the Air Force, as opposed to the DHA. *See id.* § 1073c(a)(3). Indeed, the actions concerned "health care and medical treatment," conduct within the purview of the DHA, as opposed to "ensuring the readiness of the members of the armed forces." *Id.* As a result, Plaintiff cannot plausibly allege that challenged actions by Air Force officials were taken on behalf of the Air Force. The Air Force is thus not a proper defendant, and the claims against it are **DISMISSED**.

c.  Remaining Claims

That leaves Dr. Cobos's claims against DHA under Section 501 of the Rehabilitation Act, as well as her claims against Decypher under the ADA, the TCHRA, and Section 504 of the Rehabilitation Act. Again, Dr. Cobos brings claims for: (1) hostile work environment based on disability, (2) constructive discharge based on disability and on protected conduct, (3) retaliatory hostile work environment, and (4) failure to reasonably accommodate.

### 1.  Hostile Work Environment Based on Disability

Dr. Cobos argues that she was subjected to a hostile work environment based on her disabilities. To make out a claim of disability-based harassment, a plaintiff must show:

> (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action.

*Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 236 (5th Cir. 2001) (quoting *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998)). "The legal standard for workplace harassment in this circuit is . . . high." *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 509 (5th Cir. 2003). For harassment to affect a term, condition, or privilege of employment, it must be "sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment." *Thompson v. Microsoft Corp.*, 2 F.4th 460, 471 (5th Cir. 2021) (quoting *Flowers*, 247 F.3d at 236). "'[W]hether an environment is hostile or abusive depends on the totality of the circumstances,' and factors such as 'the frequency of the conduct, its severity, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance,' are considered." *Strife*

*v. Aldine Indep. Sch. Dist.*, 138 F.4th 237, 248 (5th Cir. 2025) (*Alaniz v. Zamora-Quezada*, 591 F.3d 761, 771 (5th Cir. 2009)).

Dr. Cobos alleges that DHA and Decypher subjected her to a hostile work environment by: denying her reasonable accommodation requests; micromanaging her time and attendance; physically monitoring her whereabouts; complaining that she made too much money, especially since she had to take time off because of her disabilities; questioning her intelligence and the quality of her work; chastising her in front of her colleagues; forcing her to take paid time off; and threatening her with disciplinary action if she could not be at the office from 7:30 a.m. to 4:30 p.m. each day. ECF No. 32 at 17–18. Dr. Cobos argues some of the alleged conduct was physically threatening, most notably, her supervisor knocking aggressively on her office door and following her into her office. ECF No. 48 ¶ 129.

The conduct Plaintiff complains of, taken as true, does not support an inference of sufficiently pervasive or severe harassment to support her disability-based hostile work environment claim. Most of Dr. Cobos's allegations concern criticism, questioning her value to DCOE and the quality of her work, and micromanagement of her attendance and whereabouts. But criticism of an employee's work performance and careful monitoring of job performance generally do not amount to a hostile work environment. *Gonzales v. Wells Fargo Bank, Nat'l Ass'n*, 733 F. App'x 795, 798 (5th Cir. 2018) ("'[C]areful monitoring of job performance[]' . . . does not rise to the level of hostile work environment harassment."); *Credeur v. La. Through Off. of Att'y Gen.*, 860 F.3d 785, 796 (5th Cir. 2017) ("Criticism of an employee's work performance . . . and even threats of termination do not satisfy the standard for a harassment claim."). Similarly, "heightened scrutiny of an employee by a supervisor" generally cannot "support a hostile work environment

claim." *Robinson v. Paulson*, No. CIV.A. H-06-4083, 2008 WL 4692392, at *18 (S.D. Tex. Oct. 22, 2008) (collecting cases).

Those general rules are not absolute—criticism or heightened scrutiny can be relevant to a hostile environment claim where they rise to a very high level or are part of a more broadly hostile environment. *See Flowers*, 247 F.3d at 236–37 (finding a fact issue on harassment where—among other things—a supervisor intercepted HIV-positive plaintiff's calls, eavesdropped on her conversations, and hovered around her desk; plaintiff was subjected to several "random" drug tests in quick succession; and plaintiff was written up multiple times and twice placed on ninety-day probation). But the allegations here do not rise to that level. *See id.*

Dr. Cobos also complains of two particular incidents. At one point, her supervisor allegedly "berated" her in front of her colleagues for being late. ECF No. 48 ¶ 69. At another, Dr. Cobos informed her supervisor that she would be late to work because of a medical flare-up. *Id.* ¶ 129. When Dr. Cobos arrived, the supervisor was "aggressively knocking on her office door." *Id.* The supervisor then followed Dr. Cobos into her office to "interrogate her about her medical conditions and what medications she was taking." *Id.* These incidents may be offensive, annoying, or rude. But they are also relatively isolated. "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted); *West v. City of Houston*, 960 F.3d 736, 742–43 (5th Cir. 2020) (finding a subordinate throwing a bag at employee "the type of isolated incident the Supreme Court has cautioned against finding actionable . . ." (cleaned up)).

Dr. Cobos attempts to analogize her case to *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437 (5th Cir. 2017). There, the plaintiff's coworkers repeatedly mocked his stutter and called him

mean names. *Id.* at 446. The mistreatment was pervasive—"he was called names like bush hog and lawnmower every week," and there was evidence that "he was repeatedly mocked by various individuals—in the hallway, on the elevator, and around his desk." *Id.* Further, the plaintiff there "testified about a particularly severe incident in which his supervisor, Greg Guillory, mocked him at a department-wide meeting." *Id.* Finally, the court found it "reasonable to infer that this harassment contributed to the anxiety that forced [the plaintiff] to miss work, thus interfering with his work performance." *Id.* In light of all that, a jury could have found harassment sufficiently severe or pervasive to support the plaintiff's hostile work environment claim. *Id.*

But unlike this case, the conduct in *Patton* was not predominately criticism, heightened scrutiny, or micromanagement. And, again, the conduct there was pervasive—many people regularly mocked the plaintiff and regularly called him names. Here, by contrast, Dr. Cobos alleges only a few instances of purported harassment with any particularity. *See Thorton v. Univ. of Texas Sw. Med. Ctr. Sch. Of Med.*, No. 24-10594, 2025 WL 619166, at *3 (5th Cir. Feb. 26, 2025) ("At the pleading stage, [courts] require facts—not conclusory allegations.").

Lastly, Dr. Cobos bases her harassment claim in part on her inability to flex her schedule or telework. This is also, of course, part of the basis for Dr. Cobos's failure-to-accommodate claim. The Court sees no reason to artificially restrict "hostile work environment" claims to categorically exclude denials of reasonable accommodations. *Cf. Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1109 (6th Cir. 2008) (finding sufficient evidence of constructive discharge based on a failure to accommodate). But it is also mindful that it should avoid "pav[ing] the way for an employee to assert a claim for [a hostile work environment] every time an employer fails to accommodate her disability." *Id.* Ultimately, "a disagreement with an employer over terms of employment or an accommodation do[es] not amount to harassment." *Clark v. Champion Nat'l*

*Sec., Inc.*, 952 F.3d 570, 585 (5th Cir. 2020). And Dr. Cobos has not alleged facts suggesting that DHA's refusal to allow telework or a flexible schedule goes beyond such a disagreement for purposes of establishing a hostile work environment claim.

As such, Dr. Cobos's hostile work environment claim based on her disabilities is **DISMISSED**.

### 2. *Constructive Discharge Claims*

Dr. Cobos's constructive discharge claims also fail. "A claim of constructive discharge . . . has two basic elements. A plaintiff must prove first that [s]he was discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign. [And] [s]he must also show that [s]he actually resigned." *Sacks v. Texas S. Univ.*, 83 F.4th 340, 347 (5th Cir. 2023) (first and fifth alterations in original) (citing *Green v. Brennan*, 578 U.S. 547, 555 (2016)). To determine whether a reasonable person would feel compelled to resign, the Fifth circuit has considered:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status].

*Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000) (alteration in original) (quoting *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994).

"Constructive discharge requires a greater degree of harassment than that required by a hostile environment claim." *Daywalker v. UTMB at Galveston*, No. 22-40813, 2024 WL 94297, at *10 (5th Cir. Jan. 19, 2024) (quoting *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001)). Having found that Dr. Cobos did not allege harassment sufficiently pervasive or severe to

support a disability-based hostile work environment claim, her constructive discharge claims must fail for the same reason.

Dr. Cobos's disability-based and retaliatory constructive discharge claims are **DISMISSED**.

### 3. *Retaliatory Hostile Work Environment*

Dr. Cobos next claims that she experienced a hostile work environment in retaliation for requesting an accommodation and complaining about discrimination.

The Fifth Circuit has not yet recognized a cause of action for retaliatory hostile work environment in this context. *Castro v. Bexar Cnty.*, No. 5:23-CV-08-DAE, 2024 WL 3071571, at *4 (W.D. Tex. May 14, 2024) (collecting cases). But every other circuit except the Federal Circuit has. *Bryan v. Chertoff*, 217 F. App'x 289, 293 n.3 (5th Cir. 2007) (collecting cases); *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012) (same); *see also Williams v. Admin. Review Bd.*, 376 F.3d 471, 477 (5th Cir. 2004) (recognizing a retaliatory hostile work environment claim under the Energy Reorganization Act's whistleblower provision).

According to some courts, the retaliatory hostile work environment standard essentially mirrors the substantive hostile work environment one. Most notably, this standard would require harassment so pervasive or severe that it "affected a term, condition, or privilege of" employment. *Castro v. Bexar Cnty.*, No. 5:23-CV-08-DAE, 2024 WL 3071571, at *4 (W.D. Tex. May 14, 2024); *Montgomery-Smith v. George*, 810 F. App'x 252, 258–60 (5th Cir. 2020) (non-precedential case applying the severe-or-pervasive standard to a retaliatory hostile work environment claim).

That standard, however, ignores an important distinction between claims based on substantive discrimination and those based on retaliation: Unlike substantive discrimination claims, retaliation claims are "not limited to discriminatory actions that affect the terms and

conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) (holding as much in the Title VII context); *Grubic v. City of Waco*, 262 F. App'x 665, 667 n.6 (5th Cir. 2008) (The Fifth Circuit "applies the same analysis to ADA and Title VII retaliation claims.").

Thus, a retaliatory hostile work environment claim does not require conduct so pervasive or severe as to affect a term, condition, or privilege of employment. *See Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1207 (11th Cir. 2021). Rather, "a retaliation claim may rest on an action that 'a reasonable employee would have found . . . [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 484 (5th Cir. 2008) (alterations in original) (quoting *White*, 548 U.S. at 68); *Babb*, 992 F.3d at 1208 (holding that this standard applies to retaliatory hostile work environment claims).

Even so, Dr. Cobos has not alleged conduct sufficiently severe to support her retaliation claim. "[N]ormally[,] petty slights, minor annoyances, and simple lack of good manners" are not enough to support a retaliation claim. *Smith v. McDonough*, No. SA-23-CV-01552-XR, 2024 WL 6069304, at *4 (W.D. Tex. June 10, 2024) (quoting *White*, 548 U.S. at 68). Antidiscrimination laws do not impose "a civility code" and "do[] not extend to '*de minimis*' workplace trifles." *Id.* (citing *Hamilton v. Dallas Cnty.*, 79 F.4th 494, 505 (5th Cir. 2023)).

For that reason, this Court dismissed the plaintiff's Title VII retaliation claims in *Smith v. McDonough*, where the employee-plaintiff alleged:

> an instance of [a supervisor] screaming at [the plaintiff]; a threat of disciplinary action, changes in leave request procedure (without decreasing [the plaintiff's] right to obtain leave); implementation of timekeeping practices only [the plaintiff] had to follow; [a supervisor] discouraging [the plaintiff] from filing a 'self-assessment;' [a supervisor] asking coworkers to report [the plaintiff] for an incident during a meeting; and a change in meeting time [the plaintiff] did not approve of.

*Id.* at *3, *5.

The Court finds the allegations here analogous to those in *Smith*. Dr. Cobos has not alleged conduct rising above "petty slights, minor annoyances, and simple lack of good manners." *Id.* at *5 (quoting *White*, 548 U.S. at 68). For that reason, Dr. Cobos's retaliatory hostile work environment claim is **DISMISSED**.

### 4.   Failure-To-Accommodate Claims

As to Dr. Cobos's failure-to-accommodate claim, DHA and Decypher argue (1) Dr. Cobos failed to exhaust her administrative remedies as to some or all of the alleged refusals to accommodate and (2) the claims fail on the merits. The Court will address each point, first as to DHA and then as to Decypher.

### A.   Exhaustion as to DHA

Dr. Cobos's remaining claims against DHA are under Section 501 of the Rehabilitation Act, which prohibits disability discrimination against federal employees. *Pinkerton*, 529 F.3d at 515. "A Rehabilitation Act claimant must satisfy the procedural requirements set forth in Title VII of the Civil Rights Act of 1964. One of these procedural requirements is the exhaustion of administrative remedies." *Ruiz v. Brennan*, 851 F.3d 464, 468 (5th Cir. 2017) (citations omitted). "The first step" in exhausting one's remedies is "contact[ing] an agency EEO counselor within 45 days of the alleged discriminatory conduct requesting informal counseling." *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002); 29 C.F.R § 1614.105(a)(1).

"When an employer denies its employee a reasonable accommodation, it is considered a discrete discriminatory act." *Smithson v. Union Pac. R.R. Co.*, 602 F. Supp. 3d 974, 981 (W.D. Tex. 2022). "Each discriminatory act starts a new clock for" exhaustion purposes. *Id*.

Dr. Cobos alleges that she reached out to DHA's EEO Complaint Manager on September 1, 2023. ECF No. 48 ¶ 122. Forty-five days before that was July 18, 2023. Dr. Cobos

does not dispute that she failed to exhaust her remedies as to any refusals to accommodate before July 18, 2023. So she may not base her failure-to-accommodate claims against DHA on refusals before that date.

### B. Merits as to DHA

The Court thus considers Dr. Cobos's failure-to-accommodate claims against DHA based on alleged refusals to accommodate after July 18, 2023, including the following:

- On July 26, 2023, DHA informed Dr. Cobos "that teleworking was not authorized per the" PWS. *Id.* ¶ 111.

- On August 2, 2023, a Decypher official informed her that DHA refused to allow her to telework. *Id.* ¶ 113.

- On September 15, 2023, Dr. Cobos's supervisor informed her that her accommodation request had been denied "because allowing accommodations would be 'preferential treatment.'" *Id.* ¶ 121.

- On or about October 23, 2023, a Decypher official informed Dr. Cobos that DHA asked "that all personnel work the contracted hours as written." *Id.* ¶¶ 134–35.

- On November 6, 2023, Plaintiff allegedly learned that DHA "would begin reprimanding contract employees" if they were "not physically present at the office from 7:30 am to 4:30 pm, regardless of whether" they used PTO. *Id.* ¶ 130. Dr. Cobos argues that, to the extent allowing her to use time off was a reasonable accommodation, this change rescinded even that.

"To prevail on a failure-to-accommodate claim, the plaintiff must show (1) [she] is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations

for such known limitations." *Moss v. Harris Cnty. Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017) (internal quotation marks omitted) (quoting *Feist v. La., Dep't of Just., Off. of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)). DHA does not dispute the first prong at this stage.

DHA attempts to narrow Dr. Cobos's failure-to-accommodate claim by arguing that from August 2023 to her resignation she did not request a flexible work schedule but only requested permission to telework. That is immaterial. The responsibility to come up with an accommodation is shared between the employer and the employee. *Strife*, 138 F.4th at 246. Dr. Cobos did not necessarily have to reup her request for a flexible work schedule every time she brought up her alleged need for an accommodation. *See Thompson*, 2 F.4th at 468–69 ("[T]he employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation."). The complaint alleges a history of Dr. Cobos requesting, and at times receiving, the ability to flex her schedule to accommodate her disabilities. *See* ECF No. 48 ¶¶ 73, 82, 92–93. Many of the requests involved DHA officials. *See id.* Those allegations support an inference that DHA knew that a flexible schedule was one accommodation option. So Dr. Cobos's failure-to-accommodate claim against DHA may rely both on its refusal to allow her to telework and on its refusal to allow her a flexible schedule.

DHA next argues that Dr. Cobos did not actually request an accommodation from DHA. "An employee who needs an accommodation because of a disability has the responsibility of informing her employer." *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 621 (5th Cir. 2009). The employee must "initiate the dialogue," and it is not enough that a "reasonable employer *might* have found that [the employee] *might* have been seeking an accommodation." *See Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 487–88 (5th Cir. 2023) (emphasis in original), *as revised* (Aug. 4, 2023).

The complaint alleges that Dr. Cobos initially requested an accommodation from Decypher, not from DHA directly. ECF No. 48 ¶ 89. But it also says she met with DHA officials about the accommodation request. *Id.* ¶ 92. And if that were not enough, DHA's contract monitor became aware of the accommodation request on July 24, 2023, at the latest—before any of the relevant denials. *Id.* ¶ 106. Those allegations are sufficient to infer that Dr. Cobos requested an accommodation from DHA.

DHA next claims that it provided Dr. Cobos a reasonable accommodation by allowing her to take time off, with or without pay. An employee is not necessarily entitled to their preferred accommodation. *E.E.O.C. v. Agro Distribution, LLC*, 555 F.3d 462, 471 (5th Cir. 2009). The provided accommodation "does not have to be the 'best' accommodation possible, so long as it is sufficient to meet the job-related needs of the individual being accommodated." *Id.* (quoting 29 C.F.R. pt. 1630, App., § 1630.9). The employer "has the ultimate discretion to choose between effective accommodations." *Id.* (same). But, "[o]f course, an accommodation cannot be so impractical that it makes the job more trouble than its [sic] worth." *Allen v. U.S. Postal Serv.*, No. 21-30699, 2022 WL 2383869, at *2 (5th Cir. July 1, 2022) (citing *US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002), as "noting that an ineffective accommodation is no accommodation at all").

DHA relies on caselaw saying that "[t]ime off, whether paid or unpaid, can be a reasonable accommodation." *Moss*, 851 F.3d at 418. But the fact that time off *can* be a reasonable accommodation does not mean that it is *always* one. The questions are whether the accommodation is effective, whether it "is sufficient to meet the job-related needs of the individual being accommodated," and whether "it makes the job more trouble than it[ is] worth." *Agro Distribution*, 555 F.3d at 471 (quoting 29 C.F.R. pt. 1630, App., § 1630.9); *Allen*, 2022 WL 2383869, at *2.

Dr. Cobos allegedly "has numerous chronic disabilities that affect her mobility, respiratory system, digestive system, nervous system, urinary system, reproductive system, and mental health." ECF No. 48 ¶¶ 61–62. As a result, she must attend regular doctor's appointments, sometimes multiple on the same day. *Id.* ¶¶ 6, 63. The complaint supports an inference that these appointments were at least weekly. *Id.* ¶ 136. And at times she experienced medical "flare-ups," requiring breaks and/or medication that "impacted her ability to work and drive." *Id.* ¶ 7. Dr. Cobos's PTO (10 hours per month) allegedly ran out quickly given the frequency of her appointments and flare-ups. *See id.* ¶¶ 82–85; 115. After her PTO ran out, she allegedly had to take a full eight hours of unpaid leave for every appointment and flare-up, even if she worked part of the day. *Id.* ¶ 85.

An accommodation "is not rendered unreasonable simply because it involve[s] some cost" to the employee. *Austgen v. Allied Barton Sec. Servs., L.L.C.*, 815 F. App'x 772, 775 (5th Cir. 2020). But the complaint supports an inference that requiring Dr. Cobos to take time off for her appointments and flare-ups—given their frequency—was not "sufficient to meet [her] job-related needs" and that "it ma[de] the job more trouble than it[ was] worth." *Agro Distribution*, 555 F.3d at 471 (quoting 29 C.F.R. pt. 1630, App., § 1630.9); *Allen*, 2022 WL 2383869, at *2.

Further, as Dr. Cobos argues, the complaint supports an inference that DHA rescinded even that purported accommodation on November 6, 2023, when it allegedly became clear that Dr. Cobos's supervisors would begin reprimanding her if she was not at the office from 7:30 a.m. to 4:30 p.m., even if she used PTO or unpaid leave. ECF No. 48 ¶¶ 130–131.

Finally, DHA argues that allowing Dr. Cobos to telework would not have been a reasonable accommodation because it would have excused her from an essential job function. As an initial matter, even if that were true, it would not destroy all of Dr. Cobos's failure-to-accommodate

claims, since those claims are also premised on alleged refusals to allow a flexible schedule and, as to the November 6 denial, to allow her to use her time off when needed.

And insofar as Dr. Cobos's failure-to-accommodate claims against DHA *do* rely on its refusal to allow her to telework, those claims are sufficiently pled. "The ADA does not require an employer to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so." *Thompson*, 2 F.4th at 467 (quoting *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999)). "'Essential functions' are 'fundamental', as opposed to 'marginal', job duties, such that a job is 'fundamentally alter[ed]' if an essential function is removed." *Credeur*, 860 F.3d at 792 (citations omitted). "Fact-finders must determine whether a function is 'essential' on a case-by-case basis." *Id.* (quoting *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)). "In determining whether a function is essential, [courts] look to the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, and the consequences of not requiring the employee to perform the function." *Thompson*, 2 F.4th at 467 (citing *Credeur*, 860 F.3d at 792).

To be clear, Dr. Cobos allegedly requested to telework and flex her time *when needed* for an appointment or flare-up, not at all times. ECF No. 48 ¶ 89. She also alleges that "[w]hen permitted to flex her schedule and/or telework, she could perform all of her job duties, as the vast majority of her work did not require in-person meetings or patient visits." *Id.* ¶ 5. Dr. Cobos's description of her main job duties supports that claim; she was responsible for various research functions that one could infer would not be meaningfully disrupted by teleworking when needed or by a flexible schedule. *See id.* ¶ 45 (describing Dr. Cobos's main job duties, which allegedly primarily included research functions, such as leading "design, planning, coordination, implementation, and evaluation of" research and quality control at DCOE).

DHA relies on the Fifth Circuit's statement in *Credeur* that "there is general consensus among courts, including [the Fifth Circuit], that regular work-site attendance is an essential function of most jobs." *Credeur*, 860 F.3d at 793. But that is not an absolute rule. *Credeur* is clear that "'[f]act-finders must determine whether a function is 'essential' on a case-by-case basis.'" *Id.* at 792. Whether regular work-site attendance is an essential function will depend on a case's specific facts. *See id.* at 793 (noting that regular worksite attendance is an essential function "especially" "when the position is interactive and involves a significant degree of teamwork"); *see also Ray v. Columbia Brazoria Indep. Sch. Dist.*, No. 24-20227, 2025 WL 1219191, at *3 (5th Cir. Apr. 28, 2025) (affirming summary judgment against a failure-to-accommodate claim in part because the plaintiff (a teacher) provided "nothing more than her unsupported testimony that she could do her job remotely"). Further, because Dr. Cobos did not request to telework full-time, ECF No. 48 ¶ 89, one could reasonably infer that her requested accommodation would *not* disrupt her "regular work-site attendance."

Finally, DHA claims telework was not a reasonable accommodation because the PWS purportedly did not allow it. A DHA official allegedly even claimed that federal antidiscrimination law "does not trump" the PWS. ECF No. 48 ¶ 108. That is incorrect. Employers have "an independent obligation to comply with" antidiscrimination laws, "and a contractual obligation to discriminate would be unenforceable." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 229 (5th Cir. 2015). So even if the PWS did bar telework or a flexible schedule, that is not determinative.

In determining whether a job function is essential, courts "must give greatest weight to the 'employer's judgment.'" *Credeur*, 860 F.3d at 792. But that is not the ultimate question or the only consideration. *Credeur*, 860 F.3d at 792; *Thompson*, 2 F.4th at 467. Again, whether a job function

is essential is a fact question to be determined on a case-by-case basis. *Credeur*, 860 F.3d at 792. Here, regardless of the PWS, Plaintiff's allegations support an inference that teleworking when necessary or a flexible schedule would not relieve Dr. Cobos of an essential job function.

C.  Exhaustion as to Decypher

Dr. Cobos's claims against Decypher are under the ADA, the TCHRA, and Section 504 of the Rehabilitation Act. Dr. Cobos exhausted her remedies as to these claims by filing a charge with the Texas Workforce Commission and waiting 180 days thereafter to sue.

On April 3, 2024, Dr. Cobos filed a charge with the Workforce Commission. Contrary to Decypher's claims, the charge clearly indicated that Dr. Cobos wanted it to be filed with the EEOC. ECF No. 33-1 at 2. First, it is addressed to the Workforce Commission "and EEOC." *Id.* Second, it clearly states, "I want this charge to be filed with both the EEOC and the State or local Agency, if any." *Id.* So, even assuming such an indication is required, as Decypher argues, Dr. Cobos has fulfilled the requirement to file a complaint with EEOC. *Cisneros v. DAKM, Inc.*, No. 7:13-CV-556, 2014 WL 258755, at *2 (S.D. Tex. Jan. 23, 2014) (" Due to a "Worksharing Agreement" between the two agencies, filing a complaint with one agency also satisfies the requirement to file with the other."). And Dr. Cobos waited 180 days after filing her charge with the Workforce Commission to sue, as is required. *Id.*

As to Dr. Cobos's federal-law claims, under the ADA and Section 504, she may bring claims based on discrimination occurring within 300 days before she filed her charge on April 3, 2024. *See Doe v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 653 F. Supp. 3d 359, 371 (S.D. Tex. 2023). That means she may bring claims based on conduct on or after June 8, 2023.

As to Dr. Cobos's TCHRA claims, the timeline is shorter. Except as to a sexual-harassment claim, which this of course is not, a claimant under the TCHRA must file a charge within 180 days

of the alleged discriminatory conduct. TEX. LAB. CODE § 21.202(a). So Dr. Cobos's TCHRA claims against Decypher may not be based on conduct before October 6, 2023.

As noted above, each denial of a reasonable accommodation "starts a new clock" for exhaustion purposes. *Smithson*, 602 F. Supp. 3d at 981. Here, some denials occurred after June 8, 2023. Most notably, Dr. Cobos's failure-to-accommodate claim against Decypher relies in part on the argument that, after DHA rejected teleworking and a flexible schedule in July 2023, Decypher had a renewed obligation to provide a reasonable accommodation within its control. For instance, it allegedly could have adjusted its leave policy to allow Dr. Cobos to take less than eight hours of unpaid leave at a time. But it did not. Given the timing of this alleged omission, Dr. Cobos's failure-to-accommodate claims against Decypher under Section 504 and the ADA are timely.

Although it makes little substantive difference, given the TCHRA and federal statutes' overlapping standards, Dr. Cobos may not base her TCHRA claims on conduct before October 6, 2023. Some refusals to accommodate in which Decypher allegedly took part occurred after that date. For instance, on or about October 23, 2023, a Decypher official told Dr. Cobos she would have to "work the contracted hours as written." ECF No. 48 ¶ 135. So Dr. Cobos's TCHRA failure-to-accommodate claims also are not entirely barred as untimely.

### D.  Merits as to Decypher

Decypher's arguments on the merits are unavailing at this stage. To start, as with the claims against DHA, the complaint plausibly alleges a failure to accommodate as a general matter.

Beyond that, Decypher claims it lacked sufficient control to "bear [any] responsibility" for the alleged failure to accommodate. *Burton*, 798 F.3d at 228. But the complaint provides allegations supporting an inference that Decypher could have provided a reasonable accommodation. For instance, Decypher allegedly had some control over policy regarding unpaid

leave, since its policy allegedly dictated how much unpaid leave an employee could take at a time. ECF No. 48 ¶ 85.

Further, even if Deypher could not, itself, provide a reasonable accommodation, it could still be liable if it "knew or should have known" of DHA's failure to do so and "failed to take corrective action within its control." *See* EEOC Enforcement Guidance: Application of the ADA To Contingent Workers Placed by Temporary Agencies and Other Staffing Firms, 2000 WL 33407189, at *2 (2000); *Burton*, 798 F.3d at 228. Again, the complaint could support an inference that Decypher had enough control here to take some such corrective action.

Ultimately, the specifics of what Decypher could and could not do to accommodate Dr. Cobos's disabilities or to correct DHA's alleged failure to do so are issues better suited for summary judgment. The pleadings are sufficient to survive a 12(b)(6) motion as to these claims.

## CONCLUSION

For the foregoing reasons, the Air Force's Motion to Dismiss (ECF No. 36) is **GRANTED**. DHA's Motion to Dismiss (ECF No. 18) and Decypher's Motion to Dismiss (ECF No. 25) are **GRANTED IN PART AND DENIED IN PART.** The following claims are **DISMISSED:**

1. All claims against the Air Force;

2. The claims against DHA under Section 504 of the Rehabilitation Act;

3. The claims against DHA and Decypher for hostile work environment, constructive discharge, and retaliation;

4. The claims against DHA for failure to accommodate based on refusals to accommodate predating July 18, 2023;

5. The claims against DHA for punitive damages;

6. The ADA and Section 504 claims against Decypher for failure to accommodate based on refusals to accommodate predating June 8, 2023;

7. The TCHRA claims against Decypher for failure to accommodate based on refusals to accommodate predating October 6, 2023.

Dr. Cobos's Section 501 failure-to-accommodate claims against DHA based on refusals to accommodate on or after July 18, 2023, remain pending. She may seek emotional distress damages on those claims. Dr. Cobos's failure-to-accommodate claims against Decypher (1) under the ADA and Section 504, based on refusals to accommodate on or after June 8, 2023, and (2) under the TCHRA, based on refusals to accommodate on or after October 6, 2023, also remain pending.

It is **FURTHER ORDERED** that the stay issued on March 27, 2025, is **LIFTED**.

It is **FINALLY ORDERED** that the remaining parties shall submit their Rule 26(f) report and proposed scheduling order **no later than thirty days after the date this Order is issued.**

It is so **ORDERED**.

**SIGNED** this 10th day of November, 2025.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE